UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

MICHE BAG, LLC,                     )
                                    )
            Plaintiff               )
                                    )
      vs.                           )        CAUSE NO. 3:10-CV-129RM
                                    )
THE MARSHALL GROUP, d/b/a           )
Sierra's,                           )
                                    )
            Defendant               )

OPINION AND ORDER

Miche Bag, LLC and The Marshall Group both sell women's handbags with detachable covers that allow a consumer to change the appearance of her purse. The Marshall Group sells its bags under the name Seasons by Sierra's. Miche Bag claims the Sierra's bags violate Miche Bag's trade dress and utility patent and three of Miche Bag's design patents. Miche Bag also claims that two of Sierra's products (the "giraffe purses") violated Miche Bag's copyrights; The Marshall Group has agreed to an injunction against the sale of those products. The court issued a temporary restraining order against The Marshall Group's sale of the Sierra's bags on May 21, 2010, and heard evidence and argument on the preliminary injunction request on June 7 and 8. For the reasons that follow, the court grants Miche Bag's motion for preliminary injunction.

Findings of fact at a preliminary injunction hearing are, like the injunction itself, preliminary — necessarily made before the parties have had an opportunity

to conduct ordinary discovery and prepare fully for trial. The court stresses at the outset that today's findings are entirely interlocutory, based entirely on what the court described in an earlier order in this case as a "quick and dirty" record. With that said, this memorandum is intended to satisfy the court's obligations under Federal Rule of Civil Procedure 52(a).

Miche Bag sells a line of budget-priced handbags with changeable covers so the consumer can change the handbag's look by changing the outer cover without the need to transfer items from one purse to another. Miche Bag considers itself a pioneer in the sale of what it describes as bundled purse products. For purposes of today's motion, Miche Bag's line consists of two handbag sizes: its "Classic Bag" and a tote-sized "Big Bag." From a business history standpoint, Miche Bag is a remarkable success story. It entered the market in July 2007, selling a single handbag with interchangeable covers in a kiosk in a regional shopping mall in Utah. In June 2010, Miche Bag markets its products through authorized distributors, representatives, and retailers. Miche Bag trains and currently contracts with 4,000 independent contractors who serve as distributors and representatives. Miche Bag reps host home parties at which a consumer may purchase a bundle of, for example, one handbag with four interchangeable covers. Some purchasers, in turn, become Miche Bag representatives. Miche Bag handbags are sold on the Home Shopping Network, but those occasions apparently produce more sales reps and distributors than sales: only 0.1 percent of Miche Bag sales come through the Home Shopping Network. Miche Bag also

sells its products on the Internet. Miche Bag's sales in 2009 amounted to $27 million, and it projects its 2010 sales at $50 million.

In the course of this growth, Miche Bag has spent $2.75 million in marketing and branding and $1.25 million in research and development and intellectual property. Marketing expenses have included a television campaign (infomercials and arranging "free" product display), Web marketing, brochures, and a public relations firm. Miche Bag spends $50,000 each month on launches of at least two new shells for each of its two bags and new accessories. Miche Bag distributors make significant expenditures to market the product line beyond what Miche Bag does.

Miche Bag has acquired extensive intellectual property rights in this business growth, including patents, trademarks, copyrights, and trade dress rights, in its handbag products and bundles. Those rights lead to the dispute in court today.

The Marshall Group makes, among other things, two handbags (with interchangeable shells) that Miche Bag contends infringe Miche Bag's trade dress, design patents, and utility patent. The record discloses considerably less about The Marshall Group than it does about Miche Bag. David Schemenauer owns The Marshall Group. The evidence identified two employees of The Marshall Group, but the record doesn't indicate how many people work for the company. The Marshall Group sells products other than handbags and shells: mention was made of shoes and a fragrance line. The Marshall Group employs trade names to

sell its products: it maintains a fragrance line called Paige Products and markets the allegedly infringing handbags and shells under the name "Seasons by Sierra's."

The record doesn't disclose how long The Marshall Group has been in operation. Mr. Schemenauer testified that he and his assistant Brandi Mayer first designed the Sierra's bags "about a year-ish ago," and that he first became aware of the Miche Bag products about a year and a half ago. Mr. Schemenauer is not computer-literate, but had seen the Miche Bag web site. He doesn't think he and Ms. Mayer acquired a Miche Bag handbag before the design process. The Sierra bags are made in China. Mr. Schemenauer went to China to arrange the manufacturing process. Although Michele Donat, an experienced purse designer, testified that spec sheets are essential in the manufacturing process, Mr. Schemenauer testified that "we" (presumably The Marshall Group, though the record doesn't indicate that The Marshall Group ever had other handbags manufactured) use sketches and information rather than spec sheets. Mr. Schemenauer testified that Miche Bag provided information about Miche Bag products to its Chinese manufacturers about three months into the process.[1]

The Marshall Group first introduced its Sierra bag to stores at a trade show in mid-January 2010; a retail customer put a Sierra bag on sale around early March. Sierra bags are now being sold in more than 360 retail outlets. The

---

[1] Mr. Schemenauer variously testified that this occurred "later in the process," "three to six months after the process started," and "about 9 months ago or before that." The court's finding simply splits the difference.

Marshall Group had Sierra bag sales of several hundreds of thousands of dollars in 2010 before the temporary restraining order halted sales. The Marshall Group has distributed 135,000 catalogs that include the Sierra bags, at a cost exceeding $75,000.

PRELIMINARY INJUNCTION STANDARD

> To win a preliminary injunction, a party must show that it is reasonably likely to succeed on the merits, it is suffering irreparable harm that outweighs any harm the nonmoving party will suffer if the injunction is granted, there is no adequate remedy at law, and an injunction would not harm the public interest. If the moving party meets this threshold burden, the district court weighs the factors against one another in a sliding scale analysis, which is to say the district court must exercise its discretion to determine whether the balance of harms weighs in favor of the moving party or whether the nonmoving party or public interest will be harmed sufficiently that the injunction should be denied.

Christian Legal Soc'y v. Walker, 453 F.3d 853, 859 (7th Cir. 2006) (citations omitted).

TRADE DRESS

Trade dress "is essentially [the] total image and overall appearance" of a product, and "may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 764 n.1 (1992). A product's unregistered trade dress is protected from infringement. 15 U.S.C. § 1125(a); Bretford Mfg., Inc. v. Smith Sys. Mfg. Corp., 419 F.3d 576, 578-579 (7th Cir. 2005). One asserting

dress infringement must show that: (1) its trade dress is protectable because it is either inherently distinctive or has acquired secondary meaning and (2) the similarity of the defendant's trade dress causes a likelihood of confusion as to the source or affiliation of the products. *See* Thomas & Betts Corp. v. Panduit Corp., 138 F.3d 277, 291 (7th Cir. 1998).

The trade dress of a ladies' handbag may be protected under the Lanham Act. Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108 (2d Cir. 2006); Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104 (2d Cir. 2000). Miche Bag's trade dress includes, but isn't limited to, the shell's removability. Miche Bag's trade is what Miche Bag defines it to be. Rose Art Indus., Inc. v. Swanson, 235 F.3d 165, 173 (3d Cir. 2000). Miche Bag seeks to protect the following configuration of its Classic Bag:

1. Unique slightly-curved upper aspect of the bag;
2. Unique curved straps;
3. Chrome, oval buckles;
4. Rigid, polygonal-shaped body;
5. Inset sides;
6. Trapezoidal-shaped zipper ends;
7. Removable decorative covers for the handbags, that enable a consumer to use the same purse or handbag with different removable decorative covers, which are available in both full-wrap and side-wrap variations; and
8. Two-tone appearance.

Miche Bag seeks to protect the following configuration of its Big Bag:

1. Unique flexible straps;
2. Chrome, round buckles;
3. Removable decorative covers for the handbags, that enable a consumer to use the same purse or handbag with different removable decorative covers with fold–over flaps; and

4.    Two-tone appearance.

The Miche Bag handbags and corresponding Sierra's handbags share these characteristics.

Miche Bag proudly notes that it has succeeded where others failed in the manufacture and marketing of purses with interchangeable covers. That argument may be important in analyzing the patent issues, but carries no weight with respect to the trade dress claim. "The Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device: that is the purpose of the patent law and its period of exclusivity." <u>TrafFix Devices, Inc. v. Marketing Displays, Inc.</u>, 532 U.S. 23, 34 (2001).

<u>Functionality</u>

Trade dress isn't protected if it is functional. <u>Wal-Mart Stores, Inc. v. Samara Bros., Inc.</u>, 529 U.S. 205, 209 (2000). If a feature is functional, "there can be no trade dress protection . . . ." <u>TrafFix Devices v. Marketing Displays</u>, 532 U.S. at 26. Miche Bag bears the burden of proving that its trade dress is not functional. <u>Wal-Mart v. Samara Bros.</u>, 529 U.S. at 209; *see also* 17 U.S.C. § 1125(a)(3). This functionality doctrine patrols the boundary between what may be patented for a limited time and what may be protected eternally as trade dress. <u>Thomas & Betts Corp. v. Panduit Corp.</u>, 138 F.3d 277, 288 (7th Cir. 1998).

The Marshall Group contends that the Miche Bag handbags' trade dress is functional because it consists almost entirely of the detachability of the shell, allowing the consumer to have what appears to be several handbags without

having to move personal belongings from one purse to another. The Marshall Group points to the statement of one of Miche Bag's experts to the effect that this interchangeability is what the Miche Bag product is "all about." Miche Bag responds that interchangeability is important to its product, but isn't critical to the trade dress. The court agrees with Miche Bag.

The Marshall Group notes that Miche Bag has applied for a utility patent for the interchangeable covers, and argues, by analogy to the expired utility patent in TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23 (2001), that Miche Bag's trade dress has to be considered functional because Miche Bag has told the Patent Office that it is functional. The Marshall Group cites no authority for the proposition that a pending patent application has the same effect as an expired patent, and the court has found none. Perhaps more importantly, Miche Bag's claimed trade dress includes, but extends well beyond, the removability feature. Miche bag agrees that the shells' removability and interchangeability are functional, but argues that the way the cover itself fits within the trade dress is not. The way in which even functional parts are assembled may be protected as trade dress. Service Ideas, Inc. v. Traex Corp., 846 F.2d 1118, 1123 (7th Cir. 1988).

Miche Bag's Classic Bag trade dress consists of a handbag with a two-tone appearance, a rigid and specifically depicted polygonal-shaped body with inset sides, a specifically depicted slightly-curved upper aspect; specifically depicted curved straps, oval chrome buckles, trapezoidal-shaped zipper ends, and

removable covers with both full-wrap and side-wrap variations.[2] Miche Bag's Big Bag trade dress consists of a handbag with a two-toned appearance, specifically depicted flexible straps, round chrome buckles, and removable covers with fold-over flaps.

Evidence at the preliminary injunction hearing indicated that Miche Bag's Internet advertising makes no specific reference to the products' non-functional features. A photograph (which depicts each of the non-functional features of the claimed trade dress) generally is accompanied by written reference to the removability and interchangeability of the shells. That Miche Bag's advertising refers specifically only to the products' functional quality weighs against a finding of non-functionality. *See, e.g.*, <u>ASICS Corp. v. Target Corp.</u>, 282 F. Supp. 2d 1020, 1029 (D. Minn. 2003) ("Advertising or other marketing by the proponent of trademark rights that touts the utilitarian features of its design can provide significant evidence of functionality."). Pictures of a product that do nothing to emphasize or call attention to its trade dress ordinarily weigh against a finding of secondary meaning. <u>Ohio Art Co. v. Lewis Galoob Toys, Inc.</u>, 799 F. Supp. 870, 876 (N.D. Ill. 1992).

On the other hand, the commonality of the non-functional features indicates the easy availability to The Marshall Group of alternate designs, which may

---

[2] At final argument, Miche Bag's counsel noted Michele Donat's testimony that the classic bag had "cuteness." A product's "cuteness" isn't trade dress. <u>Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.</u>, 280 F.3d 619, 630-631 (6th Cir. 2002) ("The aura about a product, the cachet that ownership or display of it creates, and the kind of appeal it has to certain consumers do not dress a good in trade.").

constitute some evidence of non-functionality. Valu Eng'g, Inc. v. Rexnord Corp., 278 F.3d 1268, 1276 (Fed. Cir. 2002).

When viewed as a whole, neither claimed trade dress — that of the Classic Bag or that of the Big Bag — is functional. The next issue is whether the Miche Bag products have acquired secondary meaning.

<u>Secondary Meaning</u>

Trade dress has secondary meaning if there is "a mental association in buyers' minds between the alleged mark and a single source of the product." Packman v. Chicago Tribune Co., 267 F.3d 628, 641 (7th Cir. 2001); *see also* Flotec, Inc. v. Southern Research, Inc., 16 F. Supp. 2d 992, 1011 (S.D. Ind. 1998) ("a mental association in buyers' minds between the alleged mark [or trade dress] and a single source of the product"), *quoting* Echo Travel, Inc. v. Travel Assocs., Inc., 870 F.2d 1264, 1266 (7th Cir. 1989).

A court looking for secondary meaning considers "(1) direct consumer testimony and consumer surveys; (2) exclusivity, length, and manner of use; (3) amount and manner of advertising; (4) amount of sales and number of customers; (5) established place in the market; and (6) proof of intentional copying." Echo Travel v. Travel Assoc., 870 F.2d at 1267.

Miche Bag hasn't presented direct consumer testimony or consumer surveys with respect to secondary meaning. Dr. Michael Belch conducted a consumer survey that the court discusses later, but his survey tested confusion, not secondary meaning. The absence of such evidence weighs against a finding of

secondary meaning. Platinum Home Mortg. Corp. v. Platinum Fin. Group, 149 F.3d 722, 728 (7th Cir. 1998).

Miche Bag's commercial use of its trade dress has been limited in time. Miche Bag began with the Classic Bag in July 2007. The Big Bag became available in the autumn of 2009. A brief commercial use isn't always inconsistent with secondary meaning, L.A. Gear, Inc. v. Thom McAn Shoe Co., 988 F.2d 1117, 1130 (Fed. Cir. 1993) ("The district court found that L.A. Gear's Hot Shots design had acquired secondary meaning during the period from its introduction in December 1987 to the time infringement began in May 1988. . . . L.A. Gear's advertising and promotion were extensive, and public demand for this design was shown, by sales figures, to have been rapidly achieved."), but this factor doesn't favor a finding of secondary meaning.

The remaining factors strongly support a finding of secondary meaning. Miche Bag has spent $2.5 million advertising its products, and spends $30,000 to $60,000 per week on a television campaign. It might be important to note that some of those sums are spent on shells rather than handbags, and that Miche Bag appears to market at least one handbag that falls outside the defined trade dress. In any event, Miche Bag has spent considerable money in advertising the products it seeks to protect.

Miche Bag has extraordinary sales. Its sales in 2009 were $27 million. Miche Bag claims to project sales of $50 million in 2010, though it doesn't explain how (or by whom) those projections were formulated. Still, Michele Donat, with

considerable experience in the field, testified that Miche Bag's sales are remarkable for any manufacturer.

Miche Bag's claim to be an innovator in the market might be overstated; The Marshall Group presented evidence of earlier patents that at least identified the concept of a removable cover on a handbag. But The Marshall Group presented no evidence to contradict Miche Bag's claim that Miche Bag dominates the market for interchangeable cover handbags today; The Marshall Group identified no competitor in the field other than itself, and indeed claims that if enjoined, its harm will consist of its inability to move in on Miche Bag's sales (with no mentioned of any other seller whose market share the Sierra bags might threaten). Interchangeable covers are only part of the claimed trade dress, but the record contains no evidence of any other current market participant selling handbags with interchangeable covers in a configuration different from the Miche Bag products.

Miche Bag's primary immediate customers are its distributors and representatives, who number more than 4,000. The record doesn't allow the court to compare that number with other similar structures (Miche Bag's distribution structure differs significantly from The Marshall Group's), but a nationwide network of 4,000 independent contractors acquiring and working to sell Miche Bag's products can't be called insignificant.

More important than the number of representatives and distributors might be the way in which they become affiliated with Miche Bag. Uncontradicted

evidence indicates that whenever Miche Bag products appear on the Home Shopping Network, viewers call Miche Bag to enlist as representatives and distributors. Uncontradicted evidence further indicates that when a representative conducts a home party showing Miche Bag wares, some enthused guests seek to join the distribution network. Those enlistees are attracted specifically by the Miche Bag products. This phenomenon is strong evidence of secondary meaning.

Finally, there is strong evidence of The Marshall Group's having copied the Miche Bag product intentionally. Ms. Donat, with extensive experience in handbag designing, testified that people within the industry provide specs to their manufacturers. That testimony was uncontradicted. The Marshall Group owner David Schemenauer testified that he didn't provide specs to his Chinese manufacturers; since this was his first foray into the purse field, he would have been in no position to contradict Ms. Donat. Mr. Schemenaur provided his manufacturers with sketches and information, then with the Miche Bag product. Ultimately, the Sierra handbags came to include not only the size and shape of the Miche Bag products, but also what Ms. Donat described as "a really unique interior pocket".

With the humility demanded by the potential holes in any preliminary injunction record, the court finds that at this point in the proceedings, it appears for all the world that The Marshall Group caused the Miche Bag products — and their trade dress — to be copied, with the copies to be sold as Sierra's products. The Marshall Group's intentional copying of the Miche Bag product might turn out

to have been permissible, <u>Libman Co. v. Vining Indus., Inc.</u>, 69 F.3d 1360, 1363 (7th Cir. 1995), but intentional copying of trade dress is proof of likelihood of confusion and secondary meaning. <u>Computer Care v. Service Sys. Enterprises, Inc.</u>, 982 F.2d 1063, 1069-1071 (7th Cir. 1992).

Based on the exclusivity of Miche Bag's use of the trade dress, the amount and manner of advertising, the amount of sales and number of customers, the method through which distributors and sales representatives enlist, Miche Bag's established place in the market, and proof of intentional copying by The Marshall Group, the court finds that the Miche Bag trade dress has acquired secondary meaning.

<u>Likelihood of Confusion</u>

Miche Bag faces a variety of hurdles in meeting its burden to show likelihood of confusion. First, because Miche Bag's claim trade dress consists of a combination of features that are themselves common in the industry (apart from the functional aspect), a greater showing of likelihood of confusion might be required at trial. *See* <u>Libman Co. v. Vining Indus.</u>, 69 F.3d 1360 (7th Cir. 1995). Second, that a feature of the Miche Bag trade dress (the interchangeability of the shells) is functional weighs against a finding of likelihood of confusion. *See* <u>Motorola v. Qualcomm, Inc.</u>, No. 97-615J, 1997 WL 838877 (S.D. Cal. Apr. 24, 1997), *aff'd without opinion*, 135 F.3d 776 (Fed. Cir. 1998).

Dr. Michael Belch is a Professor of Marketing at San Diego State University (where he has taught since 1976) and co-director of the Centre for Integrated

Marketing Communications at San Diego State. At Miche Bag's request, Dr. Belch conducted an empirical research study employing an Internet survey in accordance with the established scientific standards. Dr. Belch's survey showed respondents three purses at a time: the Miche Bag Classic Bag, the corresponding Sierra's bag, and a third bag chosen by Dr. Belch's wife, herself an expert in marketing (and more importantly, a consumer of purses); and the Miche Bag Big Bag, the corresponding Sierra's bag, and a third bag chosen by Dr. Belch's wife.

Dr. Belch surveyed 417 Internet shoppers, and found that 49.5 percent of the respondents believed that the Miche Bag Classic Bag and the corresponding Sierra purse were made by the same company, and that 32 percent thought the Miche Bag Big Bag and the corresponding Sierra's tote bag were made by the same company. The third bag (the control stimulus) was included to establish a benchmark to account for noise and/or guessing. According to Dr. Belch, a measure of confusion can be calculated by subtracting the perceived association between the Miche Bag purse and the control stimulus from the association between Miche Bag and the Sierra bag and test stimuli. By this formula, the net confusion was 27.1 percent for the smaller purses and 16.2 percent for the larger purses.

A second stage of Dr. Belch's study addressed the removable covers. That stage of the study will be important to patent analyses, but discloses nothing about confusion from trade dress. The first stage of the study presented the

products with the covers in place — effectively the trade dress that Miche Bag claims.

The Marshall Group argues that its products lack the Miche Bag logo found on the Miche Bag products, and bear a hang tag and an interior label disclosing origin. A clear source identifier on a product counsels against a finding of likelihood of confusion. <u>Pampered Chef, Ltd. v. Magic Kitchen, Inc.</u>, 12 F. Supp. 2d 785, 795 (N.D. Ill. 1998); *cf.* <u>Schwinn Bicycle Co. v. Ross Bicycles, Inc.</u>, 870 F.2d 1176, 1187 (7th Cir. 1989) ("A label cannot altogether preclude the possibility of likelihood of confusion.").

This argument doesn't persuade the court. Neither the hang tag nor the interior label is visible to Internet purchasers, so the labeling has little impact on the likelihood of confusion. Further, potential consumers who see Sierra's bags that others acquired are unlikely to see a hang tag (which consumers almost certainly will remove) or an interior label, and so believe the Sierra's bag is made by or sponsored by Miche Bag. "This misuse of goodwill is at the heart of unfair competition." <u>Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.</u>, 799 F.2d 867, 873 (2d Cir. 1986).

Dr. Belch's survey suffices to satisfy Miche Bag's burden of showing likelihood of confusion at this stage of the proceedings.

BALANCE OF IRREPARABLE HARMS

> In the first phase of the [preliminary injunction] analysis, the court decides only whether the plaintiff has any likelihood of success-in other words, a greater than negligible chance of winning, but in the second phase, the court evaluates that likelihood of success, as the analysis turns to a "sliding scale" under which a lesser likelihood of success can be made sufficient by a greater predominance of the balance of harms. In performing this balancing, the court bears in mind that the purpose of a preliminary injunction is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit."

AM General Corp. v. DaimlerChrysler Corp. 311 F.3d 796, 804 (7th Cir. 2002) (citations omitted).

While recognizing that neither side has presented what might become its strongest case, the preliminary injunction record persuades the court that Miche Bag has a strong likelihood of success on its trade dress claim. Its trade dress extends well beyond the functional aspect of the interchangeable covers; every factor in the secondary meaning analysis other than direct consumer testimony, consumer surveys, and length of use weighs heavily in Miche Bag's favor; and Dr. Belch's survey appears to have been well-conducted and is uncontradicted.

Miche Bag will suffer considerable irreparable harm if the court denies this injunction and later finds that it should have been entered. Most of the Sierra bags are priced somewhat below the corresponding Miche Bag product, which will cause Miche Bag to lose sales to The Marshall Group or reduce its own price. *See* Polymer Tech., Inc. v. Bridwell, 103 F.3d 970, 975-976 (Fed. Cir. 1996) (price erosion is irreparable harm). Evidence at the hearing indicates that the Sierra bags are of considerably lower quality than Miche Bag's products, so the sale of

Sierra bags coupled with the likelihood of consumer confusion will damage Miche Bag's reputation and goodwill. *See* <u>Ty, Inc. v. Jones Group, Inc.</u>, 237 F.3d 891, 903 (7th Cir. 2001). Because Miche Bag appears to have no major, legitimate competitors in its market, any sales by The Marshall Group will cut into Miche Bag's market share. *See* <u>Hybritech, Inc. v. Abbott Labs.</u>, 849 F.2d 1446, 1456 (Fed. Cir. 1988) (loss of market share may constitute irreparable harm). Since Miche Bag consumers form a cognizable share of its distribution scheme, market erosion also will disrupt that marketing scheme. *See* <u>Ty, Inc. v. GMA Accessories, Inc.</u>, 132 F.3d 1167, 1173 (7th Cir. 1997).

It is harder to identify the harm to The Marshall Group from an injunction later found to have been improvidently entered. Mr. Schemenaur tried to calculate the loss his company will suffer if enjoined from marketing its Sierra's handbags, but his methodology is unpersuasive: he attempted to extrapolate from his product growth in a line of fragrances and Miche Bag's sales per seller, and wove criticisms of Miche Bag in and out of his testimonial explanation of his method. The court can give no weight to Mr. Schemenaur's estimate.

Further, while Miche Bag is a purse company, handbags are a new addition to The Marshall Group product line. If enjoined from continued sales of the Sierra's bags, The Marshall Group still would have available to it all the business lines it had in 2009.

The Marshall Group doubtless would be harmed by an erroneous preliminary injunction. The Marshall Group has spent money to market its

handbags — not as much as Miche Bag has because The Marshall Group has been in the business for considerably less time (the Sierra's handbags were sold for only eighty-four days before the temporary restraining order took effect). Sales will be lost. But there is no basis to find that the risk of harm to The Marshall Group of an erroneous injunction ruling is anywhere near the corresponding risk to Miche Bag.

CONCLUSION

In all, Miche Bag has shown a strong likelihood of success on the merits of its trade dress claim, and that the balances of harms from an erroneous injunction decision weighs greatly in its favor. Protection of product identification through trade dress fosters the public interest. Miche Bag is entitled to a preliminary injunction to prohibit The Marshall Group from selling purse products that infringe Miche Bag's trade dress.

The court's review of the patent issues leads to the conclusion that success or failure of the motions for preliminary injunction on those claims would not affect the scope of the injunction to which Miche Bag is entitled on its trade dress claim. It appears to the court that the trade dress claim encompasses all of the features addressed in the patent issues. If this is correct, further analysis would only extend the time the court needs for preparation of a ruling, without practical effect. Accordingly, subject to any motion for reconsideration, the court will grant

the preliminary injunction motion in part, to the extent it seeks an injunction based on its trade dress claim.

In argument on the motions, The Marshall Group asked the court, if an injunction were to be granted, to define the proscribed conduct with greater specificity than was found in the temporary restraining order. That request is sound. *See* <u>Trumbelus, Inc. v. Cranmer</u>, 399 F.3d 754, 767 (6th Cir. 2005) (injunction against a likely trade dress infringement requires specificity as to protected aspects of plaintiff's product). On the other hand, since trade dress includes appearance, and the reach of language is limited, perfect specificity lies beyond the court's reach. The injunction will include the definition of the trade dress of the products as the court has evaluated it and the drawings in Miche Bag's submissions. The court supplements that description with this explanation: the court's intention is to prohibit The Marshall Group from making and selling products described in the trade dress and of the approximate size, shape, and configuration of Miche Bag's Classic Bag and Big Bag. The injunction is not intended to prohibit the manufacture or sale of any other product with interchangeable covers.

Finally, The Marshall Group also asked the court, if an injunction were to be granted, to increase the bond from the $250,000 set for the temporary restraining order. The court declines to do so.

> When setting the amount of security, district courts should err on the high side. If the district judge had set the bond at $50 million, as Abbott requested, this would not have entitled Abbott to that sum;

Abbott still would have had to prove its loss, converting the "soft" numbers to hard ones. An error in setting the bond too high thus is not serious. (The fee for a solvent firm such as Mead Johnson or its parent Bristol-Myers Squibb Co. to post a bond, a standby letter of credit, or equivalent security is a very small fraction of the sum involved.) Unfortunately, an error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond.

Mead Johnson & Co. v. Abbott Labs., 201 F.3d 883, 888 (7th Cir. 2000) (citation omitted). The court set the TRO bond with this principle in mind. Because the court finds Mr. Schemenaur's "harm" estimate unreliable and unpersuasive, the court really has no better yardstick by which to measure the bond at the close of the preliminary injunction hearing than it had when it granted the motion for a temporary restraining order.

Having already erred on the high side and with no reason to think better of the earlier decision, the court will set the bond for the preliminary injunction at $250,000.

ORDER

The court GRANTS IN PART the plaintiff's motion for entry of a preliminary injunction based on Miche Bag's claims (Doc. No. 30) as follows:

1.    The Marshall Group, its officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with any of them, are hereby enjoined from distributing, selling, offering for sale, importing, or otherwise using in commerce:

a.  Handbags or purses with a size and shape similar to the Miche Bag Classic Bag, depicted as follows:



and more specifically described as follows:

i.  Unique slightly-curved upper aspect of the bag;

ii.  Unique curved straps;

iii.  Chrome, oval buckles;

iv.  Rigid, polygonal-shaped body;

v.  Inset sides;

vi.  Trapezoidal-shaped zipper ends;

vii.  Removable decorative covers for the handbags, that enable a consumer to use the same purse or handbag with different removable decorative covers, which are available in both full-wrap and side-wrap variations; and

        viii.    Two-tone appearance.

b.      Handbags or purses with a size and shape similar to the Miche Bag Big Bag, depicted as follows:



and more specifically described as follows:

i.      Unique flexible straps;

ii.     Chrome, round buckles;

iii.    Removable decorative covers for the handbags, that enable a consumer to use the same purse or handbag with different removable decorative covers with fold–over flaps; and

iv.    Two-tone appearance.

2.     The Marshall Group, its officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with any of them, are hereby enjoined from selling, reproducing, preparing derivative works, distributing copies, and/or displaying:

    a.      Sierra's handbag covers identified as "SW102 Giraffe";

    b.      Sierra's handbag covers identified as "SB301 Red Giraffe"; and

    c.      Any handbag or cover that is substantially similar to Miche Bag's Copyright Registration Nos. VA 1-652-763 ("Jayma" design) (effective Nov. 19, 2008) and VA 1-685-132 ("Lexi (7503) Giraffe Handbag Design") (effective Sept. 1, 2009).

3.     This order shall be in effect throughout the pendency of this action.

4.     In light of the previously posted $250,000.00 bond, this Order is effective immediately.

5.     The court declines to address, as unnecessary, the plaintiff's request for a preliminary injunction based on its patent allegations.

SO ORDERED.

ENTERED:   June 16, 2010

                       /s/ Robert L. Miller, Jr.
                      Judge
                      United States District Court